Filed 8/17/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| WILL TAYLOR et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>FINANCIAL CASUALTY & SURETY, INC.,<br><br>    Defendant and Respondent. | D076869<br><br><br><br>(Super. Ct. No.<br> 37-2016-00015444-CU-OE-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Affirmed.

The McMillan Law Firm and Scott A. McMillan for the Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith and Ernest Slome, Jeffry A. Miller, Lann G. McIntyre, Timothy J. Watson, Katherine C. DenBleyker and Caroline E. Chan for the Defendant and Respondent.

Plaintiffs and appellants Will Taylor, Ken Gorman and Nicholas Wayman, individuals who formerly conducted bail fugitive recovery, appeal from a summary judgment in favor of defendant and respondent Financial Casualty & Surety, Inc (FCS), a surety admitted to write bail in California. Plaintiffs sued FCS and other bail-agent entities and individuals for, inter

alia, fraud, various Labor Code[1] violations (wage and hour, classification, and notice) as well as statutory damages under the Labor Code, conversion, unfair competition, discrimination and wrongful termination, alleging in part that FCS was a co-employer with the right to control the manner in which they performed their assignments.  FCS moved for summary judgment on grounds plaintiffs were not FCS employees as a matter of law, disposing of their claims based on the Labor Code as well as for fraud and conversion, which related to misrepresentations of their employment status or withholding final paychecks.  The trial court granted the motion, in part ruling FCS did not employ plaintiffs for purposes of causes of action based on the Labor Code or dependent on an employment relationship; plaintiffs' claims for fraud and conversion were barred by the "new right-exclusive remedy doctrine"; and plaintiffs could not make out a claim for unfair competition on their allegations that FCS violated the law.

Plaintiffs contend the trial court erred by its ruling.  With the exception of their conversion cause of action which they concede is unavailable, they argue summary judgment was improperly granted because (1) the court ignored their operative complaint's allegations of agency and too narrowly construed that pleading; (2) FCS failed to present admissible evidence to shift the summary judgment burden to them; (3) the agreements between FCS and the other defendants purporting to limit FCS's liability are unlawful; (4) FCS's liability stems from its agency relationship with the codefendant bail agents; (5) FCS is directly liable for Labor Code violations as an employer as it exercised control over their wages, hours and working conditions, knew of their work, and had a common law employment relationship with plaintiffs;

---

[1]     Undesignated statutory references are to the Labor Code.

and (6) they brought valid causes of action for fraud, unfair competition, discrimination and wrongful termination.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND[2]

On review of the court's grant of summary judgment, " 'we view the evidence in the light most favorable to plaintiffs as the losing parties, resolving evidentiary doubts and ambiguities in their favor.' " (*Gund v. County of Trinity* (2020) 10 Cal.5th 503, 508, fn. 2.)

FCS, a Texas corporation, is a casualty and surety company.  It writes surety bonds that guarantee a bond principal's performance and issues them through licensed bail bondsmen throughout the country.  FCS contracts with the bail bond companies for those companies to sell FCS's surety bonds at a fixed premium.  Plaintiffs are former bail fugitive recovery persons[3] who were hired by or took assignments from defendant Daniel McGuire and/or one or more of Daniel McGuire's brothers.  Among other tasks, plaintiffs

---

[2]     Our review was made difficult by pagination errors between the appellate record and FCS's briefing, as well as the length and content of plaintiffs' additional separate statement of facts containing 483 assertions.  A separate statement in the summary judgment process is intended to facilitate the trial judge's decision.  It should "expedite and clarify the germane facts." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 438; *Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 183.)  Here, plaintiffs include legal propositions (such as a proposition that California law requires bail sureties to operate through licensed bail agents), facts having no evidentiary support, and facts having no apparent relation to the issues presented by FCS's motion, such as plaintiff Taylor did not disclose his cancer diagnosis out of fear of losing his job.

[3]     A "bail fugitive recovery person" is a person provided written authorization by a licensed bondsman or bonding company and who is contracted "to investigate, surveil, locate and arrest a bail fugitive for surrender to the appropriate court, jail or police department, and any person who is employed to assist . . . ."  (Pen. Code, § 1299.01, subd. (d).)

located and apprehended criminal defendants who violated their conditions of bail.

In mid-2009, FCS and Daniel McGuire, doing business as Bail Hotline Bail Bonds (Hotline), as well as others related to McGuire,[4] entered into two bail bond agreements. One, entitled "Retail Producer Bail Bond Agreement" (the producer agreement), was made in April 2009. The producer agreement identifies as the producer Daniel McGuire and/or Hotline "and such other companies and businesses, which may be established in furtherance of Producer's expansion of its bail bond business." It describes the relationship between FCS and the producer as principal and independent contractor, defining the producer as "an independent contractor duly licensed by its state of operation as a bail bondsman and contracted by [FCS] to issue bail bonds for [FCS]." The producer agreement further states the producer has "no power or authority to bind [FCS] with respect to any obligation or liability whatsoever" and is "not authorized to act as a general agent" under its terms. The producer agreement provides that the producer "shall have exclusive control over its agency and employees"; "shall set its own working hours"; "shall retain or discharge employees or independent contractors at Producer's sole discretion"; and was "solely responsible . . . for the proper screening, selection, and hiring/retaining of all its employees and/or independent contractors."

The second agreement, entitled "General Agent Bail Bond Agreement" (the general agent agreement), was made in June 2009. The agreement defines "General Agent" as "an independent contractor duly licensed by its

_____

[4] The agreements were also signed by "Marco A. McGuire Jr. and/or Gilbert McGuire and/or Maritza McGuire and/or Cesar E. McGuire and/or Zulma McGuire" as either "Producer Indemnitor[s]" or "General Agent Indemnitor[s]."

4

state(s) of operation to legally perform the obligations of the General Agent under this Agreement." It likewise states that despite using the phrase "General Agent," the relationship between FCS and the general agent is that of principal and independent contractor: "The use of the term 'General Agent' in this Agreement is for the convenience of the parties only and is not intended to alter the relationship of principal and independent contractor." It further provides: "General Agent is not an employee of [FCS], and shall have no power or authority to bind [FCS] with respect to any obligation or liability whatsoever, except as specifically set forth herein." The general agent agreement contains similar language to the producer agreement giving the general agent "exclusive control over his or her general agency and/or retail bail agency or subproducers." It provides that the general agent "shall set his or her own working hours"; "shall retain or discharge employees or independent contractors at General Agent's sole discretion"; is "solely responsible for seeking out and obtaining any and all specialized knowledge and skills necessary in his or her professional function"; and is "solely responsible for the proper screening, selection and hiring/retaining of all its employees, and/or independent contractors and/or sub-producers." It places "sole[ ] responsibil[ity] on the agent for itself, its subproducers, employees and independent contractors for bail bond-related activities, and all dealings with bail bond defendants, obligating the agent to comply with all applicable laws, statutes, regulations and prudent business practices used in the bail bond business."

Under the general agent agreement, FCS and the general agent are to "jointly establish and maintain a direct contractual relationship with sub-producers" with FCS having the option of taking over the direct enforcement of those contracts. That provision contains the agent's irrevocable offer to

5

assign FCS the right it might have to enforce the agent's agreements with sub-producers, employees, and/or independent contractors, and FCS "shall have the right, but not the duty, to accept this assignment."

Both agreements prohibit the producer or general agent from using or allowing the use of FCS's name in any advertising "or in any manner, which may induce a belief that [they are] an employee of or in any way associated with [FCS] other than [FCS's] supplying of bonds to [them] in a wholesale manner." Both agreements include a provision requiring FCS to provide "bail bond Powers of Attorney" to the producer or general agent. That provision states that the producer or general agent "shall be authorized to utilize such bail bond Powers of Attorney to post bail bonds at such time as [the producer or general agent] has obtained collateral for [FCS's] benefit, consistent with the guidelines set forth in the Letter of Underwriting Authority . . . ." Both agreements require the producer or agent to "comply with any and all procedural directions, rules and regulations distributed by [FCS]" for the producer or general agent's adoption. The agreements require the producer or agent "to ensure that [they] will solicit, collect, protect, insure, return, apply and deliver" bond collateral as directed by FCS, and permit FCS at its discretion to direct the agent or producer to deliver the collateral to it as bond security.

After being terminated from their jobs in 2015, plaintiffs sued FCS, Daniel McGuire, Hotline, DMCG, Inc. (DMCG), other licensed bail agents and related entities for fraud, various wage and notice violations of the Labor Code, conversion, unfair competition, discrimination and wrongful termination.[5] Plaintiffs allege that each of the defendants employed them

---

[5] The other named defendants are Fugitive Recovery International, Inc., Fugitive Recovery Investigations, Inc., McGuire Bros. Enterprises, Inc.

under California law as set forth in *Martinez v. Combs* (2010) 49 Cal.4th 35 (*Martinez*). They allege that FCS in the regular scope of its business posted bail bonds and appointed DMCG as its general agent to sign those bonds. They allege FCS had the right to control the manner in which fugitive recovery personnel performed their assignments, and exercised control over plaintiffs' wages, hours and working conditions, suffered or permitted plaintiffs to work; or created a common law employment relationship with plaintiffs such that FCS was plaintiffs' "co-employer." Plaintiffs allege defendants misclassified them as independent contractors and committed numerous wage and hour violations, including by failing to pay overtime wages, failing to provide specified information, and failing to report injuries on the job. They allege FCS had joint and several liability under section 2810.3 as a "client employer" that provided workers to perform labor within that law's meaning. Plaintiffs allege defendants concealed information that they were required to disclose under the Labor Code. According to plaintiffs,

---

(McGuire Bros.), Cesar McGuire, Gilbert McGuire, Alejandro Topete, and Michael Leon. The operative second amended complaint's causes of actions are for (1) intentional misrepresentation and fraudulent nondisclosure; (2) statutory damages and compensation (§§ 226.8, 2699); (3) failure to provide itemized and accurate wage statements (§ 226); (4) failure to maintain and furnish required records (§§ 226, 1174, 1198.5); (5) failure to indemnify for necessary expenditures (§ 2802); (6) failure to pay overtime wages under sections 510, 1194 and Industrial Welfare Commission (IWC) Wage Order No. 4-2001; (7) failure to pay all wages due to discharged and quitting employees (§§ 201, 202, 203, 1194); (8) fines, costs and penalties under section 2699 by Taylor against defendants for other Labor Code violations; (9) violations of sections 2810, 2753, and 2810.3 to keep copies of contracts or entering into contracts knowing they do not include funds sufficient to allow the contract to comply with laws governing the labor; (10) conversion; (11) unfair competition; (12) wrongful termination, discrimination and retaliation in violation of section 1102.5, subdivision (c); (13) unlawful discrimination or disparate treatment (Gov. Code, § 12940); and (14) wrongful termination in violation of public policy.

7

defendants engaged in unfair competition by their Labor Code violations and conversion of plaintiffs' money, and they sought injunctive relief to stop defendants' misclassification of employees as independent contractors. In their claim for wrongful termination, plaintiffs allege defendants did not display and publish the notice of employee rights and responsibilities set forth in section 1102.8, and that defendants retaliated against them for reporting various violations and refusing to participate in unlawful activities. Plaintiffs allege defendants unlawfully discriminated against them because Gorman and Taylor are over 40 years old and Wayman suffers from post-traumatic stress disorder. They allege they were wrongfully terminated for asserting their rights as employees and because they were owed unpaid overtime wages.

FCS moved for summary judgment or alternatively summary adjudication of issues. It argued that even if plaintiffs were employees of the other defendants they were not employees of FCS as a matter of fact or law because they could not establish the requisites of any form of employment relationship, entitling it to judgment as a matter of law. FCS argued those undisputed facts disposed of all causes of action based on alleged Labor Code violations; the discrimination and wrongful termination claims also failed because they required an employment relationship, and the fraud and conversion claims failed as based on alleged misrepresentation of employment status or withholding of final paychecks. FCS pointed to the producer agreement, arguing that agreement negated any claim that FCS was plaintiffs' employer. On plaintiffs' fraud cause of action, FCS further argued it had never made any oral or written communication to plaintiffs and the cause of action was prohibited by the "new right-exclusive remedy" doctrine. As for plaintiffs' unfair competition claim, FCS argued it failed as it

8

was based on the meritless Labor Code violations and plaintiffs did not allege a claim based on unfair or fraudulent activity likely to deceive the public.

FCS submitted declarations of its president William Shields, as well as Gilbert McGuire and Caesar McGuire. Shields explained that FCS was a casualty and surety company that writes bail surety bonds, and contracts with bail bond companies for those companies to sell FCS's surety bonds at a fixed premium. He stated based on his knowledge as a director, member of the audit committee, and review of books and records, FCS's business has never included fugitive recovery and it had no employees performing such work. He averred that all of FCS's staff worked in Texas; since 2009 it did not have employees working in California, and it never had a California payroll tax account or state employer identification number. Shields attested that in April 2009, FCS had entered into the producer agreement with McGuire Bros. and that agreement in 2010 was assigned to DMCG. Shields stated that based on the agreement, his review of records related to FCS's relationship with Hotline and his personal knowledge of that relationship, Hotline "at all times . . . alone . . . had the sole and exclusive power to make all decisions related to its business and the hiring, managing, discipline and termination of its employees and independent contractors." He stated FCS "had no right to and did not participate in the application, interview or hiring process for any [Hotline] employee or independent contractor" and it "never directed or influenced [Hotline] to recruit, interview, hire, engage, discipline or discharge any specific employee or independent contractor." According to Shields, FCS never set wages for Hotline employees or independent contractors, specify the tasks to be performed by them or dictate their work schedules. Shields stated that under the producer agreement, FCS lacked authority to be part of any employment decision made by Hotline, and it

9

never provided opinions or input to Hotline regarding any of its employees or independent contractors.

Shields averred that he had inquired of FCS staff and caused a review of FCS personnel and payroll records, and based on that investigation stated that FCS never had a relationship with plaintiffs; never hired, fired or communicated with them; and played no role in Hotline's decision to hire or fire them. He stated FCS did not decide plaintiffs' compensation, job duties, or work schedules; it never directly or indirectly paid them; it never trained, disciplined supervised or promoted them; and it did not provide tools, forms, supplies or a physical site to do their work. Shields stated FCS did not have authority to prevent plaintiffs from working and it never did so.

Gilbert McGuire stated that since 2005, he was a shareholder and director of McGuire Bros., doing business as Hotline. He stated Hotline was in the business of posting bail bonds on behalf of criminal defendants until DMCG was formed in 2010, and he was an officer and director of DMCG since January of 2010. Gilbert McGuire stated that based on knowledge gained from his involvement in their operations, both McGuire Bros. and DMCG contracted directly with fugitive recovery agents. He averred that starting in 2012, DMCG contracted with Fugitive Recovery Investigations, Inc. ("FRI") for fugitive recovery services and FRI contracted directly with fugitive recovery agents including plaintiffs.

Gilbert McGuire further stated plaintiffs contracted to work as recovery agents with McGuire Bros. from 2008 through 2010 and DMCG from 2010 through 2012. He recounted that McGuire Bros. entered into the producer agreement in April 2009, and attested that a true and correct copy was attached to FCS's papers. Gilbert McGuire averred that at no time from the date of the producer agreement to the present did either entity receive wages,

10

salary or compensation from FCS for issuing FCS bail bonds. He stated McGuire Bros. and DMCG had exclusive decisionmaking authority regarding their business, employees and independent contractors. According to him, FCS "provided no guidance, direction or mandate regarding either of those entities' operations or the individuals who worked for either of those entities, regardless of whether they were employees or independent contractors." Neither entity included FCS in the application, interview or hiring process for any employee or independent contractor, nor did they solicit FCS's input in the discipline or termination of any employee or independent contractor. FCS had no input in or authority over McGuire Bros. and DMCG regarding recovery agents, including plaintiffs.

Gilbert McGuire averred that plaintiffs were never told FCS was their employer or that FCS paid their wages. It was McGuire Bros. and DMCG that maintained the records for plaintiffs' services and payments made to them. Gilbert McGuire stated based on his positions he was familiar with the ownership, officers and directors of McGuire Bros. and DMCG and FCS never had any ownership interest in either entity, nor was FCS an officer or director of either entity.

Caesar McGuire averred he was the chief executive officer and a director of FRI. He stated that since 2012, DMCG contracted with FRI for fugitive recovery services, and from 2012 to 2015, FRI contracted directly with fugitive recovery persons including plaintiffs. According to him, the beginning and end of the relationship between FRI and plaintiffs was the product of an agreement between FRI and plaintiffs only. The agreement between FRI and plaintiffs also determined the tasks to be performed by them. Likewise, plaintiffs' compensation was determined by the agreement

11

between FRI and plaintiffs; FRI paid them without receiving any money from FCS to make those payments.

Caesar McGuire stated that FRI retained exclusive decisionmaking authority regarding its business, employees and independent contractors. He stated FCS provided bail bonds to DMCG but gave no guidance, direction or mandate regarding any of FRI's operations or the individuals working for it, whether they were employees or independent contractors. He stated FRI never included FCS in the application, interview or hiring process and never solicited its input in the discipline or termination of any employee or independent contractor. According to Caesar McGuire, FRI had never been a bail agency and it had no contractual or other relationship with FCS. Cesar McGuire stated FRI did not consult FCS regarding any decisions involving plaintiffs, and FCS had no input in or authority over FRI regarding its recovery agents including plaintiffs. He stated FRI never informed plaintiffs that FCS was their employer or that FCS was paying their wages. FRI maintained the records related to plaintiffs' services and payments made to them. Cesar McGuire stated based on his knowledge gained from his position with FRI, and his familiarity with DMCG, that FCS had no ownership interest in either entity and FCS had never been an officer or director of either company.

Plaintiffs opposed the motion, arguing FCS was liable because the other defendants were its actual and or ostensible agents, and Insurance Code section 1800 deemed the bail bondsmen the surety's agent as a matter of law. According to plaintiffs, the "entire underpinning of FCS's motion [was] wrong" as the general agency agreement had replaced the producer agreement, and provided FCS "plenary authority" over its general agent's conduct of the bail business. Plaintiffs characterized the producer and

12

general agent agreements as unlawful "private contracts" that were an attempt to exculpate FCS from its obligations to third parties. They accused FCS of using a "red herring" in its summary judgment declarations, asserting neither McGuire Bros. nor FRI were licensed bail agents or private investigation firms that could conduct fugitive recovery services. According to plaintiffs, FCS failed to meet its initial summary judgment burden because portions of the Shields and Gilbert McGuire declarations lacked personal knowledge. Plaintiffs maintained there were triable issues of material facts as to their claims for fraud, conversion, unfair competition, discrimination, and wrongful termination, and those causes of action were otherwise sound.

Plaintiffs submitted lengthy declarations of each plaintiff and attorney Scott McMillan. They asked the trial court to judicially notice certain records from the California Department of Insurance, the absence of records of licensure, and facts from the decision in *People v. Financial Casualty & Surety, Inc.* (2016) 2 Cal.5th 35.

Plaintiffs' declarations purported to summarize their employment with Hotline and the various entities, including FCS. All of them characterized FCS as a "principal" or the other defendants as "agent[s]" of FCS in their declarations, claiming that "[a]s principal to . . . DMCG," FCS "had the right to control the manner in which personnel performed their assignments in apprehending the criminally accused defendants" and "[b]y law, we were unable to work without authorization by the surety or its bail agent." Plaintiffs all stated they were "unaware of any limitations upon the authority of the McGuires, or of DMCG . . . . to act on behalf of [FCS]."

Wayman characterized himself as "work[ing] for [Hotline] as an agent of FCS." He averred that when he worked without a team, he "reported to middle management who reported directly to Daniel McGuire, Cesar

13

McGuire, Gilbert McGuire and any [Hotline] executives, as to the time and manner in which the assignment was to be completed." He stated: "The McGuires exercised near complete control over every manner in which the fugitive recovery services were performed: what times were worked; what equipment was required; what clothing was worn; how documents were to be maintained online; fixed locations to be attended; procedures demonstrated though training to be followed; protocols on what databases to search for information and the persons to search for information on . . .; the content and control of each case assignment; and the composition of the 'teams[.'] " Wayman stated: "Over the more than 7 years that I worked for [Hotline] as an agent of FCS, never did I or any other recovery agent that worked for [Hotline] think that we worked for any other company but [Hotline] as agents of FCS . . . ."

Gorman averred that in 2008 he began taking assignments from Hotline for recovery of FCS's bail defendants through his contacts Gilbert and Cesar McGuire. He stated all of the papers and documents he received from the McGuires reflected that they were acting as an agent for FCS. According to Gorman, he "knew [he] was working for the bail bond sureties" because various documents, including the Penal Code section 1300 "Undertaking for Arrest" and the face sheet of the bail bond, used the word "agent," which to him "means that the bail agent was doing the business of its principal, the surety." Gorman stated that the documents "always had the name of the surety as the person that was instructing me to go arrest the bail fugitive" and particularly "identified [FCS] as the person on whose behalf my services were rendered." Though Gorman claimed FCS expected him to do various specific tasks, including "snap[ping] to attention when . . . [Kathleen Ledbetter, an FCS employee] was concerned about a forfeiture" or doing what

14

FCS's lawyer told him to do, Gorman also averred like the other plaintiffs that the McGuires "exercised nearly complete control over every manner in which the fugitive recovery services were performed . . . ." He related how Cesar and Gilbert McGuire had directed or approved policies and procedures, or made decisions about meetings, working hours, assignments, hiring, firing, and evaluation of recovery agents. Gorman averred that he received many e-mails from FCS attorney John Rorabaugh asking for updates on a case or telling him to write or turn in a declaration. He related an instance where he received an email from Hotline's legal department manager regarding a large forfeiture that was also sent to Ledbetter.[6] Gorman averred he communicated directly with FCS attorney Rorabaugh regarding the status of his efforts to recover FCS's fugitives, as well as Ledbetter to give her updates, and thus FCS knew he was working to recover their fugitives. Gorman stated he was never told there was a " 'side agreement' that limited [FCS's] obligations to [him]" and he was never provided a copy of the producer agreement or general agency agreement. He stated he "understood that DMCG . . . was the agent for [FCS] and that what the McGuires were doing was within the scope of that agency."

Taylor averred he was "hired by Cesar and Gilbert McGuire as an agent for . . . Hotline . . . and [FRI]." He characterized FCS as a "principal" or the other defendants as "agent[s]" of FCS throughout his declaration, claiming that "[a]s principal to . . . DMGC" FCS "had the right to control the

---

[6]    This email reads in part: "[Y]ou were assigned to the above referenced $300K FFT. Were you aware of the forfeiture out of Las Vegas? [¶] Cesar, If this issue hasn't been assigned . . . we need to do so right away. See attached and the note below from Kathleen Ledbetter, FCS. Please advise." Ledbetter's note read: "The Nevada posting agent called and got an extension on this case until January 21st. Do you know if the defendant can be surrendered by January 20th?"

manner in which personnel performed their assignments in apprehending the criminally accused defendants" and "[b]y law, were unable to work without authorization by the surety or its bail agent." Nevertheless, like Gorman and Wayman, Taylor averred that Cesar and Gilbert McGuire were in charge of the Recovery Department, and that the McGuires "exercised nearly complete control over every manner in which the fugitive recovery services were performed." Taylor also claimed there were "many occasions where FCS employees would be in the offices conducting walk-throughs of the building and auditing files and records" and that they "always asked [him] if [he] was working hard 'catching bad guys.' " Taylor testified he "believe[d] [he] was doing work for [FRI] and DMCG . . . on behalf of the surety company [FCS]" and was "unaware of any limitations upon the authority of the McGuires, or of DMCG . . . to act on behalf of [FCS]."

Plaintiffs submitted deposition testimony from Ledbetter that FCS had agent managers who handled so called "inactive" or "run-off" bail agents who were in breach of their contracts with FCS. She testified she was in charge of agent compliance: monitoring Department of Insurance requirements and ensuring agents were licensed correctly. She confirmed some FCS personnel visited bail agent offices to see that bond paperwork was in order. Plaintiffs submitted deposition testimony from FCS representative Robert Sabo that forfeitures were expected in the industry. Sabo testified he visited Hotline's offices once or twice a year for "[a]gent relations" and "updating on how things were going." Tony Smith, an FCS executive vice president, testified in his deposition that when he first started working for FCS he supervised some fugitive recovery work for it in Texas, Maryland and North Carolina. The deposition testimony indicated FCS employees knew Hotline had its own in-house fugitive recovery department.

Both parties filed objections to the evidence submitted by the other side.

The court granted summary judgment in FCS's favor. It ruled that as to plaintiffs' causes of action based on violations of the Labor Code, (causes of action two through nine and twelve through fourteen) FCS did not employ plaintiffs, but was "merely the surety and had no input on Plaintiffs' work environment or their pay." It ruled the other "contracting defendants" were responsible for hiring, firing and compensating plaintiffs, setting their pay rates and determining their work schedules. The court ruled plaintiffs' fraud claims were barred by the new right-exclusive remedy doctrine.[7] It ruled as to plaintiffs' unfair competition claim that they could not succeed on their allegations of violations of law. The court denied plaintiffs' request for judicial notice in its entirety.

Plaintiffs filed this appeal from the ensuing judgment.

DISCUSSION

I. *Summary Judgment Standards and Appellate Review*

" 'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citations.] The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish," ' the elements of his or her cause of action." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720; *Two Jinn, Inc. v. Government Payment Service, Inc.* (2015) 233 Cal.App.4th 1321, 1330.) A moving defendant's initial burden is to present evidence that either conclusively negates an element of each of the plaintiffs' causes of action or

[7] The court ruled that plaintiffs had conceded they could not pursue a conversion claim based on *Voris v. Lampert* (2019) 7 Cal.5th 1141, which as stated, plaintiffs do not challenge on appeal.

17

shows that plaintiffs do not possess, and cannot reasonably obtain, evidence necessary to establish at least one element of each cause of action. (*Henderson v. Equilon Enterprises, LLC* (2019) 40 Cal.App.5th 1111, 1116.) "Once the defendant satisfies its initial burden, 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto.' " (*Henderson*, at p. 1116.) However, a party may not raise a triable issue of fact by relying on evidence that will not be admissible at trial. (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 543; see also *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 945.)

We review a trial court's ruling on a motion for summary judgment de novo. (*Samara v. Matar* (2018) 5 Cal.5th 322, 338; *Bjork v. State Farm Fire & Casualty Co.* (2007) 157 Cal.App.4th 1, 5-6.) " 'In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment.' " (*Bjork*, at p. 6.) We consider " ' " ' "all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." ' " (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; see *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286.) " 'We affirm the trial court's decision if it is correct on any ground the parties had an adequate opportunity to address in the trial court, regardless of the reasons the trial court gave.' " (*Wolf v. Weber* (2020) 52 Cal.App.5th 406, 410.)

Where, as here, the lower court does not rule at all on evidentiary objections, this court presumes it overruled them and considered the disputed

evidence in ruling on the motions. (*Ghazarian v. Magellan Health Inc.*, *supra*, 53 Cal.App.5th at p. 183, citing *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534; *Rodriquez v. E.M.E., Inc.* (2016) 246 Cal.App.4th 1027, 1032.) On appeal, the burden is on the objecting party to renew any relevant objections by arguing the issue with relevant authority and legal analysis. (*Ghazarian*, at p. 183; *Stewart v. Superior Court* (2017) 16 Cal.App.5th 87, 100 [insufficient for appellant to request that the reviewing court consider its written objections and disregard objectionable material].)

## II. *Trial Court's Framing of Plaintiffs' Complaint*

Plaintiffs contend the lower court erred by, at FCS's urging, overly narrowly construing the allegations of their complaint so as to disregard the agency allegations. Relying on *Pierson v. Helmerich & Payne Internat. Drilling Co.* (2016) 4 Cal.App.5th 608, they argue FCS did not fairly identify the issues presented in their complaint and the "mis-characterization of the complaint rendered [FCS's] motion defective."

Because our review is de novo, such arguments focusing on the trial court's ruling or actions are misplaced. " '[I]t is axiomatic that we review the trial court's rulings and not its reasoning.' [Citation.] Thus, a reviewing court may affirm a trial court's decision granting summary judgment for an erroneous reason." (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336; *Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140 [on appeal following summary judgment, the trial court's reasoning is irrelevant].)

To the extent plaintiffs maintain we should conclude FCS did not meet its threshold burden because it mischaracterized or ignored their agency allegations, we reject the contention. FCS's summary judgment motion addressed law pertaining to formation of an agency relationship, and

specifically argued based on the producer agreement it was undisputed that "neither FCS nor McGuire Bros./DMCG agreed that McGuire Bros./DMCG would act as FCS'[s] agent for any employment issue" or "the scope of authority that FCS delegated to McGuire Bros./DMCG in the [bail bond agreement] did not and does not include the power to engage employees on behalf of FCS and to bind FCS as the employer of those employees." FCS argued "[n]o triable issue of material fact exists to imply that McGuire Bros./DMCG was FCS'[s] agent to hire plaintiffs." *Pierson* states a summary judgment motion will be "defective" if, among other things, the moving party "fails to . . . accurately identify the facts that are material to the legal theory upon which the *motion* is based." (*Pierson v. Helmerich & Payne Internat. Drilling Co.*, *supra*, 4 Cal.App.5th at p. 617, italics added.) FCS's motion was based on its claim that it was not plaintiffs' employer (or, for that matter, a California employer) and its separate statement focused on related facts, including whether FCS exercised decisionmaking authority or control over plaintiffs' work as fugitive recovery agents, whether it paid them for their services, or whether it had any ownership interest or common officers and directors with any McGuire entity. Under *Pierson*, there is no basis to deny FCS's motion on any asserted defects in its moving papers.

III. *Evidentiary Challenge to Defendant's Declarations*

Plaintiffs repeat their challenge to portions of the declarations of William Shields and Gilbert McGuire that FCS submitted with its motion, arguing as a result of their deficiencies FCS did not meet it burden to present sufficient admissible evidence so as to shift the burden of proof to them. Because the court did not rule on these objections, we consider them impliedly overruled and review whether plaintiffs have shown that ruling to

20

be error.  (*Ghazarian v. Magellan Health Inc.*, *supra*, 53 Cal.App.5th at p. 183.)

A.  *Shields Declaration*

Plaintiffs contend Shields's declaration concerning FCS's entry into the producer agreement with Hotline lacks personal knowledge.  They point to his statement that FCS's agreement was between "McGuire Bros. . . . doing business under the name Bail Hotline Bail Bonds" and then was assigned to DMCG, claiming the assertion is "wrong," and Shields's deposition testimony showed "he didn't know what he was talking about."  They complain Shields lacked personal knowledge to state that FCS's business has never included fugitive recovery and it has never had employees performing such a task: "Reviewing books and records, being a director, and member of the audit committee does not lend itself to personal knowledge."  Plaintiffs say they presented opposing deposition testimony from Cesar McGuire, Robert Sabo, and Tony Smith, an FCS executive vice president, that "capturing fugitives is part of the bail bond business" and Smith had experience in fugitive recovery. They argue Shields "lacked personal knowledge regarding Mr. Smith's role and activities when he signed his declaration."  Plaintiffs say the lack of personal knowledge was evidenced by the "ease by which [Shields's] declaration was impeached by his own colleague's deposition testimony . . . ."

That plaintiffs presented assertedly contrary summary judgment evidence from other witnesses does not render Shields's statements inadmissible or without personal knowledge, and none of plaintiffs' authorities suggest otherwise.[8]  At most, the contrary evidence raises issues

---

[8]    In *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, the court recited the general principle that a summary judgment motion must be based on admissible evidence, including personal knowledge and evidentiary fact, not legal conclusions, ultimate facts, hearsay, conclusions or impermissible

of Shields's credibility, and summary judgment may not be granted on the court's evaluation of credibility. (Code Civ. Proc., § 437c, subd. (e) ["summary judgment shall not be denied on grounds of credibility"]; *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 840.) This is not an extreme case where the declaration is facially so incredible as a matter of law that it can be ignored or rejected as untruthful. (See *People v. Schlimbach* (2011) 193 Cal.App.4th 1132, 1142, fn. 9.) Shields made his statements as FCS's president since 2017, as a member of its board of directors since 2010, and a member of its board's audit committee, familiar with FCS's books and records. He stated he had personal knowledge of the facts stated in his declaration, and we conclude his background and experience sufficiently

---

opinions. (*Id.* at p. 1120.) There, a party's declaration was based on opinion and conclusions instead of evidentiary facts, and some of his statements were contradicted by *his own* deposition testimony (not that of other witnesses, as is assertedly the case here), rendering it inadmissible or irrelevant. (*Ibid.*) *People v. Lewis* (2001) 26 Cal.4th 334 is cited for the general rule that a witness must have personal knowledge by a present recollection of an impression derived from the exercise of the witness' own senses. (*Id.* at p. 356.) Plaintiffs do not analyze *Lewis* any further. In *Maltby v. Shook* (1955) 131 Cal.App.2d 349, the court found fault with a party who submitted the declaration of *his counsel* in opposition to a summary judgment motion, which asserted counsel's beliefs as to various issues and was held to lack personal knowledge and constitute mere opinion or conclusion. (*Id.* at pp. 353-354.) That declaration further did not address the merits of the matter at issue: whether the plaintiff was a lawful assignee or had standing to bring the action. (*Id.* at p. 354.) Finally, *Gay v. Torrance* involved an attorney declaration "entirely made on 'information and belief' " and thus the court found it stated no facts within the affiant's knowledge. (*Gay v. Torrance* (1904) 145 Cal. 144, 150-151.) Shields's statements were not made on information and belief, and therefore it is not inadmissible for lack of personal knowledge. (Compare, *Overland Plumbing, Inc. v. Transamerica Ins. Co.* (1981) 119 Cal.App.3d 476, 483 [declaration made "to the best of my knowledge and belief" implies something similar to information and belief, which is insufficient to show personal knowledge].)

22

established his personal knowledge of the information provided. Independently considering plaintiffs' objections, we hold they were properly overruled as to Shields's declaration.

B. *Gilbert McGuire Declaration*

Plaintiffs contend the trial court erred by failing to sustain their objections to Gilbert McGuire's declaration on grounds it lacked personal knowledge or foundation, and was not the best evidence. They complain about the fact Gilbert McGuire states that McGuire Bros. was in the business of posting bail bonds, when during his deposition he testified he did not know whether McGuire Bros. had an active bail license in the State of California, and they therefore assert Gilbert McGuire's "suggestion . . . that McGuire Bros. . . . conducted bail business [*sic*] is baseless." Plaintiffs argue Gilbert McGuire knew he was employed by DMCG or Daniel McGuire, not McGuire Bros. They argue these problems caused Gilbert McGuire to lack personal knowledge sufficient to authenticate the producer agreement or alternatively show he either did not read or "falsely authenticated" his declaration, raising triable issues of fact.

These arguments again raise issues of credibility, not admissibility. As for the foundation for his statements, as summarized above, Gilbert McGuire averred he was a McGuire Bros. shareholder and director since the company was formed in 2005, and also was an officer and director of DMCG since its formation in 2010. He stated he and had been "involved in operations of McGuire Bros. and DMCG during the course of my relationship with both companies." He averred that McGuire Bros. was in the business of posting bail bonds until DMCG's formation in 2010. Other than the absence of personal knowledge, plaintiffs do not specify what foundational or preliminary facts are missing from his declaration as to render it

23

inadmissible.  We conclude Gilbert McGuire's status as a McGuire Bros. and DMCG officer and director gave him sufficient personal knowledge to establish a foundation for his assertions.  (Evid. Code, §§ 401-403.)  At his deposition, Gilbert McGuire could not say whether McGuire Bros. had an active California bail license, but that does not contradict his statement that the company conducted a bail bond business; at most it would suggest McGuire Bros. was not conducting business *lawfully*, a statement that Gilbert McGuire did not make.  In short, Gilbert McGuire's deposition responses that he did not know whether McGuire Bros. held a valid California bail agent license is not a " ' "clear and unequivocal admission" ' " contradicting the statements in his declaration as to render them *inadmissible*.  (See *Mackey v. Board of Trustees of California State University* (2019) 31 Cal.App.5th 640, 658 [rule that a plaintiff cannot defeat summary judgment by declaratory statements contradicting deposition testimony only applies where plaintiff makes a clear and unequivocal contradictory admission], quoting *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21, disapproved on other grounds in *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 944.)

As for the secondary evidence rule, under that rule, oral testimony is generally not admissible to prove the contents of a writing.  (Evid. Code, § 1523, subd. (a).)  Plaintiffs do not point out in what manner Gilbert McGuire sought to prove the content of a writing in his declaration, and thus they have not demonstrated merit to their best evidence objection.  In short, plaintiffs' objections to Gilbert McGuire's declaration were properly overruled.

IV. *Wage and Hour-Related Claims*

A. *The Applicable Legal Test*

Plaintiffs' wage and hour-related causes of action either allege Labor Code violations (causes of action two through nine) or arise from conduct alleged to be in violation of the Labor Code (fraud and unfair competition, first and eleventh causes of action). As plaintiffs correctly concede, in actions under the Labor Code to recover unpaid wages (and for other wage and hour violations under the Labor Code wage statutes and Fair Labor Standards Act (FLSA)), FCS's liability turns on whether it employed plaintiffs within the meaning of the applicable IWC wage order governing the industry. (*Martinez, supra*, 49 Cal.4th at pp. 52, 64, 66; *Mattei v. Corporate Management Solutions, Inc.* (2020) 52 Cal.App.5th 116, 122-123; *Futrell v. Payday Cal. Inc.* (2010) 190 Cal.App.4th 1419, 1428-1429 (*Futrell*) [applying *Martinez's* definition to causes of action alleging violations of sections 203, 226, 510 and 1194].) Here, that is IWC Wage Order 4-2001, regulating wages, hours and working conditions in the professional, technical, clerical, mechanical and similar occupations. (Wage Order No. 4; Cal. Code Regs., tit. 8, § 11040.) Wage Order No. 4 contains the same definitions as the wage order at issue in *Martinez*: it defines the term "employ" as "to engage, suffer, or permit to work." (Cal. Code Regs., tit. 8, § 11040, subd. 2(E); see *Martinez*, at p. 48, fn. 9.) The alternative phrasing means that control over either wages, hours, or working conditions will create an employment relationship. (*Mattei*, at p. 123.)

Given the wage order similarities, *Martinez's* analysis of employment governs here. (Accord, *Futrell, supra*, 190 Cal.App.4th at p. 1429.) *Martinez* involved an action for Labor Code minimum wage violations, breach of contract and unfair competition by agricultural workers against the grower

who had hired them as well as several produce merchants who had contractual relationships with the grower.  (*Martinez*, *supra*, 49 Cal.4th at pp. 42-44, 48.)  The produce merchants moved for summary judgment (the grower had gone bankrupt) and in opposition, plaintiffs claimed among other things that the merchants jointly employed them with the grower.  (*Id*. at p. 48.)

*Martinez* held that "[t]o employ . . . under the IWC's definition, has three alternative definitions.  It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship."  (*Martinez*, *supra*, 49 Cal.4th at p. 64.)  The court observed the words "suffer" and "permit" were employment terms of art.  (*Ibid*.)  The third prong, "to engage," embodied the common law definition of the employer-employee relationship.  (*Ibid*. ["the verb 'to engage' has no other apparent meaning in the present context than its plain, ordinary sense of 'to employ,' that is, to create a common law employment relationship"].)

The *Martinez* court began by assessing whether the defendant merchants suffered or permitted plaintiffs to work and/or exercised control over their wages, hours or working conditions.  (*Martinez*, *supra*, 49 Cal.4th at p. 68.)  It explained that the "suffer or permit" definition arose in the context of statutes prohibiting child labor and were "generally understood  to impose liability on the proprietor of a business who knew child labor was occurring in the enterprise but failed to prevent it, despite the absence of a common law employment relationship."  (*Id*. at p. 69.)  According to the court, that meaning was still relevant today:  "A proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that

26

work by failing to prevent it, while having the power to do so." (*Ibid*.) The basis for liability under this definition is thus a defendant's failure "to prevent the unlawful condition" or " 'to perform the duty of seeing to it that the prohibited condition does not exist.' " (*Ibid*.) *Martinez* held it was not enough to show that the produce merchants knew plaintiffs were working and that the work benefitted them; *Martinez* held two of the merchants did not suffer or permit the plaintiffs to work because "neither had the power to prevent plaintiffs from working. [The grower] and his foremen had the exclusive power to hire and fire his workers, to set their wages and hours, and to tell them when and where to report to work." (*Id*. at p. 70.) Though the producers could have withdrawn their business and forced the grower to fire the workers, that was the case with any substantial purchaser of commodities, and "[s]uch a business relationship, standing alone, does not transform the purchaser into the employer of the supplier's work force." (*Ibid*.)

*Martinez* rejected the argument that one merchant "exercised indirect control over [the grower's] wages and hours" via its contractual relationship with the grower as well as its decisions regarding what payments to advance to him and demands that he harvest produce that would not produce a net return. (*Martinez, supra*, 49 Cal.4th at pp. 71-72.) The court observed that the wage order's definition of employer encompassed any person who "directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (*Ibid*.) There was no evidence raising a triable issue on that point because the undisputed facts showed the grower "alone controlled plaintiffs' wages, hours and working conditions" (*id*. at p. 71) and nothing showed the merchant compelled the grower to harvest on any occasion. (*Id*. at p. 72.) "More

27

importantly," according to *Martinez*, the plaintiffs' factual assertions did not establish the producers' business relationship with the grower allowed them to exercise control over the grower's employees' wages and hours; rather, the grower alone "hired and fired plaintiffs, trained and supervised them, determined their rate and manner of pay . . . , and set their hours, telling them when and where to report to work and when to take breaks." (*Id.* at p. 72.) The plaintiffs' assertion that the merchants "dominated [the grower's] financial affairs" was irreconcilable with that evidence. (*Ibid.*)

Plaintiffs further argued that one producer exercised control over their wages and hours because it had sent an agent to a site to convince them to continue to work and guaranteed they would be paid by checks being delivered to the grower. (*Martinez*, *supra*, 49 Cal.4th at p. 74.) But the evidence showed the plaintiffs understood they were not working for the producer because of the nature of their work; it was reasonably apparent they were harvesting in bulk rather than packing for sale and understood the distinction because they questioned the individual about whether everyone would be paid. (*Ibid.*)

*Martinez* further rejected the plaintiffs' argument that the merchants became joint employers by exercising control over their working conditions through field representatives doing quality control and contract compliance. (*Martinez*, *supra*, 49 Cal.4th at p. 75.) In doing so, it acknowledged multiple entities may be employers where they "control different aspects of the employment relationship. This occurs, for example, when one entity (such as a temporary employment agency) hires and pays a worker, and another entity supervises the work." (*Id.* at p. 76.) There, though the field representatives interacted with the plaintiffs to demonstrate packing styles or point out mistakes and checked the plaintiffs' work, the court held this did

28

"not indicate the field representatives ever supervised or exercised control over [them]. No evidence suggests [the grower's] employees viewed the field representatives as their supervisors or believed they owed their obedience to anyone but [the grower] and his foremen." (*Id*. at p. 77.) Though the plaintiffs argued the *right* to exercise control over how work was performed, even if unexercised, was sufficient to establish an employment relationship, the court stated the contracts between the grower and merchants did not give the merchants the right to direct their work, and no evidence suggested that anyone believed the merchants or their representatives had such a right. (*Ibid*.)

After *Martinez*, appellate courts have considered whether employment relationships were created in franchisor/franchisee and other business models, including those involving lessee operators who are required comply with certain tasks so as to meet an owner's brand standards. (E.g., *Curry v. Equilon Enterprises, LLC* (2018) 23 Cal.App.5th 289, 292-294 [gas station owner was not a joint employee with lessee/operators even though operators were required to perform specific tasks to maintain safety, accounting and owner's brand standards and owner had the right to enter and inspect or audit compliance with operator agreement]; *Henderson v. Equilon Enterprises, LLC, supra*, 40 Cal.App.5th 1111 [same]; *Futrell, supra*, 190 Cal.App.4th 1419 [payroll processing company providing services to television commercial producer was not a joint employer over producer's employees]; *Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4th 1176, 1186-1191 [franchisor who provided payroll services to franchisee was not a joint employer for purposes of Labor Code wage statutes where franchisor exercised no control over franchisee's employees, including hiring or firing, rate of pay, work hours or working conditions].)

More recently, the California Supreme Court decided in the tort liability context whether a franchisor was the principal or employer of a franchisee's supervisor, who had allegedly sexually harassed a subordinate. (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 477-478 (*Patterson*).)  At issue in *Patterson* was the propriety of imposing vicarious liability on the franchisor for the franchisee's wrongdoing.  (*Id*. at p. 477; see *Vazquez v. Jan-Pro Franchising International, Inc.* (2021) 10 Cal.5th 944, 955, fn. 3 [framing the question in *Patterson*].)  The *Patterson* court asked whether a franchisor stood in an employment or agency relationship with the franchisee and its employees for purposes of holding it liable for workplace injuries, holding the answer was dependent on the "inherent nature of the franchise relationship itself."  (*Id*. at p. 478.)  The court concluded that "imposition and enforcement of a uniform marketing and operational plan cannot *automatically* saddle the franchisor with responsibility for employees of the franchisee who injure each other on the job."  (*Ibid*.)  Rather, liability depended on whether the franchisee "retained or assumed a general right of control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees."  (*Ibid*.; see also *id*. at pp. 497-498.)  According to the court "any other guiding principle would disrupt the franchise relationship" which was marked by mutual benefits: to "build and keep customer trust by ensuring consistency and uniformity in the quality of goods and services, the dress of franchise employees, and the design of the stores themselves."  (*Id*. at p. 490.)

*Patterson* rejected the argument that the franchise agreement in that case deprived the franchisee of the means and manner of asserting managerial control so as to make each franchisee the agent of the franchisor

for all business purposes. (*Patterson*, *supra*, 60 Cal.4th at p. 496.) The court explained that franchisees are owner/operators who hold a personal and financial stake in the business, and had the right to hire the people who work for them and oversee their performance each day. (*Id*. at p. 497.) Thus, the mere fact the franchisor reserved the right to require or suggest uniform workplace standards to protect its brand and the quality of customer service was "not, standing alone, sufficient to impose 'employer' or 'principal' liability on the franchisor for statutory or common law violations by one of the franchisee's employees toward one another." (*Id*. at p. 498, fn. 21.) Examining the plaintiffs' Fair Employment and Housing Act (FEHA) statutory claims under principles of agency and respondeat superior, it examined " 'the control exercised by the employer over the employee's performance of employment duties.' " (*Id*. at p. 499.) That standard required " 'a comprehensive and immediate level of "day-to-day" authority' over matters such as hiring, firing, direction supervision and discipline of the employee." (*Ibid*.)

In *Patterson*, the franchise contract recited there was no principal-agent relationship between Domino's and the franchisee and the franchisee had no authority to act on the franchisor's behalf. (*Patterson*, *supra*, 60 Cal.4th at p. 500.) It stated that the persons who worked in the store were the franchisee's employees, and no employment or agency relationship existed between them and Domino's; the contract made the franchisee solely responsible for managing its employees with respect to the proper performance of their tasks. (*Ibid*.) Thus, the franchisor lacked contractual authority to manage the behavior of the franchisee's employees. (*Ibid*.)

The summary judgment evidence did not compel a different conclusion. Domino's did not advise or consent on any termination or rehiring decisions;

31

it was not involved in monitoring or reporting sexual harassment complaints at the local level, and the evidence did not permit an inference that Domino's was in charge of terminating the troublesome employee. (*Patterson*, *supra*, 60 Cal.4th at pp. 502-503.) *Patterson* concluded "[n]o reasonable inference can be drawn that Domino's, through [its area leader], retained or assumed the traditional right of general control an 'employer' or 'principal' has over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees. Hence there is no basis on which to find a triable issue of fact that an employment or agency relationship existed between Domino's and [the franchisee] and its employees in order to support [plaintiff's'] claims against Domino's on vicarious liability grounds." (*Id.* at p. 503.)

B. *Nature of Surety and Bail Agent Relationship*

This case involves the relationship of surety insurer FCS and its designated bail agents or bondsmen to transact bail undertakings.[9] California civil bail proceedings and the licensing and business practices of professional bondsmen are regulated by statute and regulations, which set up a licensing procedure under the Insurance Commissioner's control. (See Pen. Code, § 1268 et seq.; Ins. Code, §§ 1800-1822; 10 Cal. Code Regs. § 2051; *People v. Financial Casualty & Surety, Inc.* (2020) 52 Cal.App.5th 347, 351 [California bail proceedings are independent from and collateral to criminal prosecutions].) " 'The object of bail and its forfeiture is to insure the attendance of the accused and his obedience to the orders and judgment of

---

[9]    "An undertaking of bail is similar to a bail bond except that '[a]n "undertaking" is executed by sureties only, while a "bond must be executed by both the principal and sureties." ' " (*Two Jinn, Inc. v. Government Payment Service, Inc.*, *supra*, 233 Cal.App.4th at pp. 1337-1338.)

the court.' [Citation.] '[A] bail bond is a contract between the surety and the government whereby the surety acts as a guarantor of the defendant's appearance in court under the risk of forfeiture of the bond. [Citations.]' [Citation.] Ultimately, if the defendant fails without sufficient excuse to appear in court as lawfully required, the surety ' "must suffer the consequences" ' and forfeit the bail." (*People v. Financial Casualty & Surety, Inc.*, at p. 351; *People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 657-658; *People v. Accredited Surety & Casualty Co.* (2012) 207 Cal.App.4th 163, 167; see §§ 1268-1269, 1305.) In the event of a defendant's failure to appear, the surety becomes the absolute debtor of the state for the amount of the bond. (*People v. Lexington National Ins. Corp.* (2014) 242 Cal.App.4th 1098, 1103-1104.) The defendant's arrest or surrender exonerates the surety. (See Pen. Code, § 1305, subd. (b)(3)(C).)

Surety insurers are required by law to execute bail undertakings through licensed bail agents ("bail bondsmen"), and only such licensees may post bail. (Ins. Code, §§ 1800,[10] 1802 ["A bail agent's license . . . permits the licensee to solicit, negotiate, and effect undertakings of bail on behalf of any surety insurer while there is in effect an unrevoked notice of appointment"]; 1802.1 [requiring bond applicants to file a notice of appointment executed by surety insurer "authorizing that applicant to execute undertakings of bail

_____

[10]     Insurance Code section 1800, subdivision (a) provides: "An insurer shall not execute an undertaking of bail except by and through a person holding a bail license issued as provided in this chapter. A person shall not in this state solicit or negotiate in respect to execution or delivery of an undertaking of bail or bail bond by an insurer, or execute or deliver such an undertaking of bail or bail bond unless licensed as provided in this chapter, but if so licensed, such person may so solicit, negotiate, and effect such undertakings or bail bonds without holding or being named in any license specified in Chapter 5 of this part."

and to solicit and negotiate those undertakings" on behalf of the surety];
*People v. Ranger Ins. Co.* (2003) 110 Cal.App.4th 729, 734-735.)  The surety
does its business through the licensed bail agent, thus, the agent may act for
the surety in receiving notice unless a statute requires otherwise.  (*Id.* at p.
735.)

To perform its obligation to secure the defendant's attendance, the
surety may designate others to assist it.  (Pen. Code, § 1301 [surety may
"himself arrest defendant or by written authority indorsed on a certified copy
of the undertaking . . . may empower any person of suitable age to do so"];
see, e.g., *People v. Amwest Surety Ins. Co.* (1991) 229 Cal.App.3d 351, 356;
*People v. Walling* (1961) 195 Cal.App.2d 640, 645.)

Plaintiffs, who were fugitive recovery persons, are involved in the
process of locating and arresting fugitives.  The Bail Fugitive Recovery
Persons Act, Penal Code sections 1299 et seq., governs the conduct and
educational requirements of such persons, and specifies who is authorized to
arrest and surrender bail fugitives.  The law defines a bail fugitive recovery
person as one who is either employed by, or provided written authorization
and is contracted with, the "bail," defined as the licensed bail agent (Pen.
Code, § 1299.01, subd. (b)), to investigate, surveil, locate and arrest a fugitive
for surrender (Pen. Code, § 1299.01, subd. (d)).  (See footnote 3, *ante.*)
Fugitive recovery persons are required to comply with laws applicable to that
apprehension.  (Pen. Code, § 1299.05.)  The act includes requirements for
notifying local law enforcement of the arrest, as well as limitations on the
means that may be used to accomplish the arrest.[11]

---

[11]  The term "bail" is used in different ways in the Penal Code, including
as a noun by reference to the surety as "the bail" or the agent as "the bail
agent."  (See Pen. Code, §§ 1301 [". . . the bail or any person who has
deposited money or bonds to secure the release of the defendant"], 1305,

## C. *FCS's Evidence Shifted the Burden of Proof to Plaintiffs*

Guided by *Martinez*, we readily conclude FCS's evidence was sufficient to establish prima facie it was not a joint employer liable for Hotline's wage and hour violations; that it lacked control over and responsibility for plaintiffs' fugitive recovery efforts on behalf of Hotline or any of the McGuire individuals/entities. Shields's declaration was competent evidence that Hotline alone had "exclusive power to make all decisions related to its business and the hiring, managing, discipline and termination of its employees and independent contractors." According to Shields, FCS "had no right to and did not participate in the application, interview or hiring process

---

subd. (a)(2)(A) ["the bail shall be released of all obligations under the bond if the case is dismissed . . . ."], 1305, subd. (b)(1) [". . . the court shall mail a copy of the forfeiture notice to the bail agent whose name appears on the bond"]; see *People v. Ranger Ins. Co.*, *supra*, 110 Cal.App.4th at p. 735 ["the bail" as used in the notice provisions of Penal Code section 1305 refers to the surety].) It is most commonly used in reference to the money or deposit to secure the prisoner's release (see Pen. Code, §§ 1268 ["[a]dmission to bail is the order of a competent court or magistrate that the defendant be discharged from actual custody upon [giving] bail"], 1304.) The Bail Fugitive Recovery Persons Act, however, specifically defines "bail" as "a person licensed by the Department of Insurance pursuant to Section 1800 of the Insurance Code." (Pen. Code, § 1299.01, subd. (b).) That act requires, among other things, that when engaged in the apprehension of a bail fugitive a licensed recovery person carry certificates of completion of the educational courses required for the license (Pen. Code, § 1299.04, subd. (b)), have in his or her possession proper documentation of authority to apprehend the fugitive issued by the bail bond company or the depositor of bail (Pen. Code, § 1299.06), except under exigent circumstances notify the local police department or sheriff's department of the intent to apprehend the bail fugitive no more than six hours before making the attempt (Pen. Code, § 1299.08, subd. (a)), not carry a firearm or other weapon unless in compliance with California law (Pen. Code, § 1299.10), and not forcibly enter a premises except as provided for in Penal Code section 844 (Pen. Code, § 1299.09, subd. (a)).

35

for any [Hotline] employee or independent contractor" and it "never directed or influenced [Hotline] to recruit, interview, hire, engage, discipline or discharge any specific employee or independent contractor." FCS never set wages for Hotline employees or independent contractors, specified the tasks to be performed by them or dictated their work schedules. The evidence was that FCS did not decide plaintiffs' compensation, job duties, or work schedules; directly or indirectly pay them; train, discipline supervise or promote them; or provide tools, forms, supplies or a physical site to do their work. Shields stated FCS did not have authority to prevent plaintiffs from working and it never did so.

Gilbert McGuire's declaration similarly established FCS gave no guidance or direction to the operations of DMCG or McGuire Bros., and FCS had no input in or authority over McGuire Bros. and DMCG regarding recovery agents' hiring process or fugitive recovery efforts. Rather, McGuire Bros. and DMCG had exclusive decisionmaking authority regarding their business. McGuire Bros. and DMCG maintained the records for plaintiffs' services and payments made to them. In short, FCS presented evidence it did not exercise control over plaintiffs' wages, hours or working conditions, and it did not suffer or permit them to work. (*Martinez, supra,* 49 Cal.4th at p. 64.) While FCS was certainly aware of plaintiffs' fugitive recovery efforts and benefitted from those efforts, those factors do not establish liability where it had no power to hinder plaintiffs' work and thus could not fail to hinder it. (*Martinez,* at p. 70; *Henderson v. Equilon Enterprises, LLC, supra,* 40 Cal.App.5th at p. 1122; see also *Futrell, supra,* 190 Cal.App.4th at p. 1434 [no evidence payroll company had allowed the plaintiff to suffer work because there was no evidence it had "the power to either cause him to work or prevent him from working"].)

36

Our conclusion is the same with regard to FCS's evidence pertaining to whether it "engaged" plaintiffs such that it had a common law employment relationship with them. (*Martinez*, *supra*, 49 Cal.4th at p. 64.) "The essence of the common law employment relationship test 'is the "control of details"— that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work . . . .' " (*Curry v. Equilon Enterprises, LLC*, *supra*, 23 Cal.App.5th at p. 304; see also *Futrell*, *supra*, 190 Cal.App.4th at p. 1434.) There are "secondary factors" (*Henderson v. Equilon Enterprises, LLC*, *supra*, 40 Cal.App.5th at p. 1122) relevant to the inquiry.[12] " '[W]hat matters under the common law is not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise.' [Citation.] 'In cases where there is a written contract, to answer that question without full examination of the contract will be virtually impossible.' " (*Mattei v. Corporate Management Solutions, Inc.*, *supra*, 52 Cal.App.5th at p. 124, citing *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 952 [written agreements are a "significant factor" in assessing the right to control]; *Grant v. Woods* (1977) 71 Cal.App.3d 647, 653 ["[w]ritten

---

[12] "These factors are: ' "(1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship. [Citations.] The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship." ' " (*Henderson v. Equilon Enterprises, LLC*, *supra*, 40 Cal.App.5th at p. 1123, fn. 4.)

37

agreements are of probative significance" in evaluating the extent of a hirer's right to control].)

Both the producer agreement and general agent agreement governing FCS and Hotline (as well as the other McGuire individuals/entities) provide that their relationship was that of principal and independent contractor, and expressly state that Hotline was not an employee of FCS. The agreements give Hotline "exclusive control" over its agency and employees, and provide Hotline "shall set its own working hours, and shall retain or discharge employees or independent contractors at [Hotline's] own discretion." Though both agreements require Hotline to conduct its dealings with bail bond principals in compliance with applicable law, regulations and prudent business practices, this did not give FCS the right to control the means and manner of Hotline's employees day-to-day work. To the contrary, the agreements provide Hotline is "solely responsible for itself, its sub-producers, and its employees and independent contractors with respect to . . . negotiating, underwriting, securing and posting of bail bonds" and "all dealings with bail bond principals/defendants, including but not limited to their court appearances, apprehension, holding, movement, arrest, extradition and/or surrender . . . ." FCS did not retain the right to exercise control over the details of Hotline's business, much less plaintiffs' fugitive recovery work.

In short, FCS's evidence prima facie demonstrates FCS did not have the requisite level of control over plaintiffs' employment, and thus it was not their employer (or joint employer) under *Martinez*.

D. *Plaintiffs' Evidence Does not Raise a Triable Issue of Material Fact on Whether FCS was Their Employer*

We turn then to whether plaintiffs demonstrated a triable issue of material fact concerning FCS's status. (*Curry v. Equilon Enterprises, LLC*, *supra*, 23 Cal.App.5th at p. 302; *Futrell*, *supra*, 190 Cal.App.4th at p. 1428.) They make a series of arguments to claim that FCS is "liable" on their causes of action, or that there are triable issues of fact on that question. Characterizing the producer agreement as "secret" and both that and the general agency agreement as unlawful side agreements, they argue those agreements do not exonerate FCS or nullify its representations to the Department of Insurance that it had appointed DMCG or Daniel McGuire to act as its general agent. They point to their statements that they were not aware of any limits on FCS's authority to control those entities. They argue FCS is liable due to an actual principal/agent relationship with Hotline, or because Hotline is FCS's ostensible agent. Plaintiffs argue FCS is directly liable as an employer under *Martinez*, *supra*, 49 Cal.4th 35 and Wage Order No. 4 because FCS exercised control over their wages, hours and working conditions, "suffered or permitted" plaintiffs to work, and had a common law employment relationship with them.

" ' "The question of whether an employment relationship exists ' "is generally a question reserved for the trier of fact." ' . . . This remains true '[w]here the evidence, though not in conflict, permits conflicting inferences.' . . . However, if neither the evidence nor inferences are in conflict, then the question of whether an employment relationship exists becomes a question of law." ' " (*Aleksick v. 7–Eleven, Inc.*, *supra*, 205 Cal.App.4th at p. 1187; see also *Mattei v. Corporate Management Solutions, Inc.*, *supra*, 52 Cal.App.5th at p. 123.)

Plaintiffs' evidence must be admissible to create a triable issue. (*Perry v. Bakewell Hawthorne, LLC*, *supra*, 2 Cal.5th at p. 543; *Curry v. Equilon Enterprises, LLC*, *supra*, 23 Cal.App.5th at pp. 302-303.) Affidavits must cite evidentiary facts, not legal conclusions or ultimate facts. (*Hayman v. Block* (1986) 176 Cal.App.3d 629, 639; *United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1018.) Though plaintiffs' evidence submitted in opposition must be construed liberally, in employment cases it " ' "remains subject to careful scrutiny." [Citation.] The employee's "subjective beliefs . . . do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations." ' " (*Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1007; *Talley v. County of Fresno* (2020) 51 Cal.App.5th 1060, 1090.)

Here, plaintiffs' declarations are interspersed with claims they were employed by FCS or that certain McGuire entities were FCS's "agent." We disregard these inadmissible conclusions. (Accord, *Duffy v. Tender Heart Home Care Agency, LLC* (2019) 31 Cal.App.5th 232, 242, fn. 7 [whether plaintiff was an employee or there was an agency relationship are legal conclusions, not facts].) We likewise disregard subjective statements that they believed they were doing work "on behalf of" FCS.

Some of plaintiffs' arguments about FCS's and Hotline's asserted ostensible agency relationship are based on the contents of a court opinion—*People v. Financial Casualty & Surety, Inc.*, *supra*, 2 Cal.5th 35—of which they unsuccessfully sought judicial notice in the trial court. Plaintiffs reiterate their request in this court.[13] We deny the request. (See *Stockton*

___

13      Plaintiffs also ask us to take judicial notice of Internet webpages from the California Department of Insurance and Department of Consumer Affairs showing FCS was an admitted bail surety from May 2007 through August 2019, the licensed bail agent status of Daniel McGuire, Gilbert McGuire, Cesar McGuire and DMCG, Inc. as well as FCS's appointment of those

*Citizens for Sensible Planning v. City of Stockton* (2012) 210 Cal.App.4th 1484, 1488 , fn. 2 [courts are not permitted to take judicial notice of the truth of factual findings in a California Supreme Court opinion].) On our review of the summary judgment we disregard all excluded evidence. (Code Civ. Proc., § 437c, subd. (c); *Patterson, supra,* 60 Cal.4th at p. 501; *Hampton v. County of San Diego, supra,* 62 Cal.4th at p. 347.)

      1. *Validity of Producer and General Agent Agreements*

We reject plaintiffs' attack on the validity of the producer and general agent agreements defining the scope of FCS's relationship with Hotline and the McGuire individuals. Plaintiffs frame their challenge as faulting FCS for

---

entities as bail agents, and the fact other McGuire-related entities—Fugitive Recovery Investigations, Inc. and McGuire Bros Enterprises—had no record of licensure with either entity. They argue the materials show that FCS was "required to conduct its business through bail agents," FCS is a "bail" within the meaning of the Penal Code, and that FCS appointed those individuals, who directed plaintiffs' fugitive recovery efforts. Notably, FCS does not dispute it is a bail surety, and Cesar McGuire admitted FRI was not a bail agency, but rather contracted with plaintiffs directly for their fugitive recovery services. Even assuming the information from these government websites is properly judicially noticeable, we would deny plaintiffs' request. The admissions make some of the materials irrelevant, a proper basis to deny the request. (*Abatti v. Imperial Irrigation District* (2020) 52 Cal.App.5th 236, 249, fn. 6.) Otherwise, " 'the proffered material is unnecessary to our decision.' " (*City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 594, fn. 3.) That FCS and Hotline or the McGuire individuals have a regulated surety/bail agent relationship does not by itself make FCS vicariously or otherwise liable as their employer. Our decision turns on the absence of triable issues of fact concerning FCS's exercise of control over plaintiffs' employment both because it lacked contractual authority to do so and it in fact did not involve itself in plaintiffs' work within the scope and meaning of the test in *Martinez, supra,* 49 Cal.4th 35.

41

failing to justify the agreements.[14] Pointing out that the surety is liable to the court on the bonds, must execute such instruments through an agent, and the Penal Code authorizes forfeiture only against the surety, plaintiffs maintain the producer and general agent agreements are contracts with an unlawful object, namely an attempt by FCS to evade bail laws by "secretly transferring its liability imposed under California law to its agent through deftly drafted contract language purporting to negate the bail industry[-]specific sections of the Penal Code and Insurance Code . . . ." Plaintiffs further assert they were unaware of the agreements and any limitations on FCS's authority over their agents because the agreements were not filed with the Department of Insurance.

On the latter point, plaintiffs' knowledge or lack thereof of FCS's contractual arrangement with Hotline does not go to the validity of the producer or general agent agreements. They have not cited any requirement, statutory, regulatory or otherwise, that requires such contracts be approved by or filed with the Department of Insurance.

As for the legality of the agreements, plaintiffs argue FCS's position in the trial court was that "all it provided was wholesale bonds" and that it was not "the party at risk." For this proposition, they cite portions of Shields's and Gilbert McGuire's declarations where the declarants merely authenticate the producer agreement, or to the producer agreement itself. Plaintiffs argue

---

14    Plaintiffs argue FCS "did not explain why the [agreements were] relevant in light of Insurance Code section 1800 to determine whether [it] accrued liability for the actions of those agents." They argue "FCS never explained why any secret agreement with FCS could nullify its representations to the Insurance Commissioner that it had appointed Daniel McGuire and DMCG . . . to act as its General Agent, or that FCS's prior representations to the public and Appellants of that agency were somehow negated as a result of any secret agreement." Such arguments do not demonstrate the existence of triable issues of fact on their causes of action.

without authority that "[u]nder California law, there is no authority for a surety to sell 'wholesale bonds' " and assert "the insurance commissioner is entitled to deny a bail license where the evidence indicates the applicant's purpose is to act as a 'dummy' for another, or . . . evade enforcement of the insurance laws." Plaintiffs do not specify what provisions in either the producer agreement or general agent agreement seek to avoid statutory or legal requirements that FCS execute its undertakings via licensed bail agents or act as the debtor on forfeiture of its bonds. The agreements define the producer or general agent as "an independent contractor *duly licensed* by its state of operation as a bail bondsman . . . ." They expressly state that Hotline and the McGuire individuals are to comply with all laws and regulations applying to "any business Producer [or General Agent] conducts or . . . performs pursuant to this Agreement," and that obligation "shall supersede any other requirement arising out of this Agreement." No provisions purport to exonerate FCS from its obligations as a surety or transfer this liability.

2. *Liability Under Actual or Ostensible Agency Theories*

Plaintiffs contend FCS is broadly vicariously liable for all wrongful acts, including employment-related offenses, committed by Hotline while transacting its bail bond business because FCS and Hotline have a principal and agent relationship. They argue agency is a question of fact for the jury, suggesting the evidence raises triable issues on this point making summary judgment improper. Plaintiffs further contend FCS should be held liable under the theory that Hotline was an ostensible agent given plaintiffs' understanding—based on the affidavits of undertaking—that FCS was acting as a principal operating though Hotline, the visits and communications from FCS representatives, and evidence via their own declarations that they would not have dealt with Hotline but for FCS's involvement.

43

We decline the invitation to replace the *Martinez* test with agency principles. As stated, in Labor Code wage and hour violation cases, the wage order definition of the employment relationship and the *Martinez* test control. (*Martinez*, *supra*, 49 Cal.4th at p. 66; *Futrell*, *supra*, 190 Cal.App.4th at p. 1431; accord, *Salazar v. McDonald's Corp.* (9th Cir. 2019) 944 F.3d 1024, 1033 [the wage order and *Martinez* test control over ostensible agency analysis in wage and hour case against franchisor alleging it was a joint employer liable for violations of the Labor Code]) While the wage order here defines an employer to mean one who "directly or indirectly, or through an agent or any other person employs or exercises control over the wages, hours, or working conditions of any person," *Martinez* explained that was intended to reach "sham" or straw man arrangements (49 Cal.4th at p. 71), and plaintiffs do not demonstrate any such arrangement so as to impose liability on FCS. Rather, plaintiffs' evidence was like that in *Martinez* with respect to the grower: the McGuires alone "exercised near complete control over every manner in which the fugitive recovery services were performed."[15]

---

[15] Pre-*Martinez* authorities, and in particular *Groves v. City of Los Angeles* (1953) 40 Cal.2d 751, relied upon by plaintiffs to support their claim of agency, are not controlling. But *Groves* is inapposite in any event. On review there was the trial court's consideration of a city ordinance imposing on persons in the bail bond or undertaking business a license tax on a portion of gross receipts, and ruling it violated the Constitution's gross premium tax provision that was "in lieu of all other taxes and licenses." (*Id.* at pp. 753-754.) The city argued the plaintiff, a licensed bail agent for an insurance company, was an independent contractor and thus plaintiff's business was taxable. Pointing out insurers were prohibited from engaging in the business except through licensed bondsmen, the California Supreme Court held the plaintiff was essentially an agent of the insurer and could not be compelled to pay the ordinance's tax. (*Id.* at pp. 756-762; see also *Western States Bankcard Assn. v. City and County of San Francisco* (1977) 19 Cal.3d 208, 218.) The question here is whether FCS should be considered plaintiffs'

Even if agency doctrine were applicable to the employment inquiry and other tort theories alleged by plaintiffs, the court in *Patterson* made clear (*Patterson*, *supra*, 60 Cal.4th at pp. 500-503) that the question of liability under an agency theory turns on the contractual authority given to Hotline by FCS, as well as the degree of control exercised by FCS over the conduct of Hotline such that Hotline's alleged wrongdoing should be deemed that of FCS. Plaintiffs' authorities acknowledge this. (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1171-1172 [" ' " 'The significant test of an agency relationship is the principal's right to control the activities of the agent' " ' "].)

There is no question that as it is required by law to do, FCS authorized Hotline, a licensed bail agent, to effect bail undertakings on its behalf. The evidence shows there were tasks FCS asked of Hotline in connection with those undertakings, such as delivery of bond collateral. FCS certainly had financial interests in the work being performed by Hotline and its fugitive recovery personnel. But there is no evidence FCS's appointment or control extended to day-to-day management, payment, hiring and firing of fugitive recovery personnel as to make FCS responsible for alleged wage and hour and other Labor Code violations. We conclude on that question there is no evidence raising a triable issue of fact under an agency theory. As in *Patterson*, FCS's agreements did not authorize Hotline and the McGuire individuals to act as general agents; the agreements provide the parties are principal and independent contractor, and give exclusive control to Hotline of its employees and independent contractors, including to set working hours, retain or discharge employees, and obtain specialized knowledge and skills.

---

employer liable for Hotline's alleged wage and hour violations, not whether plaintiffs are independent contractors for purposes of tax liability.

45

That the agreement gave FCS the right to "enforce applicable agreements against [Hotline's] sub-producers, employees, and/or independent contractors" does not give FCS the right to set Hotline's employee's hours, wages or working conditions.

Nor did plaintiffs present evidentiary facts to suggest FCS in fact exercised any such control. Plaintiffs presented evidence that FCS advised the Department of Insurance that it had authorized DMCG to use certain forms, including a form entitled "Authorization to Arrest Defendant." Gorman averred the files issued to him contained such documents, and he "only received a file with the intent to make a lawful arrest and the surety companies knew of my responsibilities to do so." He averred fugitive recovery personnel were "unable to work without authorization by the surety or its bail agent." He stated that when FCS representatives visited Hotline, they made it clear that the recovery department personnel kept it from having to pay in the event a fugitive was not recovered. He pointed out that he received emails from FCS's attorney asking him to modify declarations to ensure they reflected personal knowledge of the declarants.

At best, the evidence shows interactions inherent in the state-regulated surety/bail agent relationship, but not FCS's control over or involvement in fugitive recovery personnel hiring, discipline, working hours, pay or how they performed their fugitive recovery assignments. (Accord, *Patterson*, *supra*, 60 Cal.4th at p. 501 [even though franchisor provided orientation materials that supplemented the training the franchisee was required to conduct, the franchisee exercised sole control over selecting the individuals who worked in his store and he did not include the franchisor in the application, interview and hiring process].) FCS's oversight over Hotline—its ensuring compliance with licensing requirements, review of legality and sufficiency of bond

46

paperwork, or requests for updates on forfeitures—is akin to a franchisor's right to require or suggest uniform workplace standards to protect its brand and the quality of customer service that is "not, standing alone, sufficient to impose 'employer' or 'principal' liability" for statutory or common law violations." (*Patterson, supra*, 60 Cal.4th at p. 498, fn. 21.) Gorman vaguely states he was expected to comply with what FCS's lawyer "told him to do" or "snap to attention" when Ledbetter was concerned about a forfeiture. But this is no different from the evidence in *Patterson* that the franchisees subjectively believed they "had little choice but to follow the advice of [the franchisor's] area leader," and "assumed that a franchisee who did not 'play ball' " would be in trouble. (*Patterson, supra*, 60 Cal.4th at p. 485.) In *Patterson*, when it came down to the specific conduct leading to the plaintiff's complaint, the evidence showed the *franchisee* chose to suspend the harasser, despite the franchisor's representative suggesting that the franchisee fire him. (*Id.* at p. 479.) Plaintiffs' evidence does not raise triable issues of fact on whether FCS was an agent responsible vicariously for wage and hour violations.

We reach the same conclusion as to ostensible agency. An agency is ostensible when a principal intentionally or negligently causes a third person to believe another individual is acting as its agent, even though the individual is not so employed by the principal. (Civ. Code, § 2317; *People v. Surety Ins. Co.* (1982) 136 Cal.App.3d 556, 562.) Plaintiffs argue FCS allowed them to believe via its affidavits of undertaking that it was a principal operating through Hotline, and they point out evidence they would not have dealt with Hotline without FCS's authority out of concern they would not be paid or would break the law without FCS's association. They argue their reliance on the agency was "reasonable based on FCS's visits to

47

the [Hotline] office to audit" and communications with Gorman, as well as FCS's acceptance of the benefits of their fugitive recovery efforts. We disregard plaintiffs' further argument that their reliance was reasonable given FCS made certain representations to the California Supreme Court as evidenced by *People v. Financial Casualty & Surety*, *supra*, 2 Cal.5th 35.

We cannot say that FCS's identification as the surety insurer on an affidavit of undertaking (a copy of which is attached to plaintiffs' opening brief) would allow plaintiffs to entertain a *reasonable* belief it was their employer, like the evidence in *Ochoa v. McDonald's Corp.* (N.D. Cal. 2015) 133 F.Supp.3d 1228, relied upon by plaintiffs. In *Ochoa*, the evidence was that plaintiffs wore McDonald's uniforms, served McDonald's food in McDonald's packaging, received paystubs and orientation materials marked with McDonald's name and logo, and, with the exception of one plaintiff, applied for a job through a McDonald's website. (*Id.* at p. 1240.) This is a far cry from the evidence here. Nor is it similar to the evidence in *Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, likewise cited by plaintiffs. There, a realtor "tout[ed]" Coldwell Banker's name on an advertising campaign, and as a consequence the sophisticated plaintiff relied upon it (he "went for the sign") without noticing a disclaimer that the realtor was an independently owned member of a Coldwell Banker affiliate entity. (*Id.* at pp. 744, 748.) Here, the general agent agreement and producer agreements prevented Hotline from using FCS's name in any advertising materials "or in any manner, which may induce a belief that [the producer or agent] is an employee of, or in any way associated with [FCS], other than [FCS] supplying of bonds to [producer or agent] in a wholesale manner." We decline to say FCS's identification as a surety on documents

48

inherent in the nature of the bail business raises a triable issue of fact as to ostensible agency to support liability for wage and hour violations.

3. Martinez *Test*

Plaintiffs contend FCS should be treated as an employer under the *Martinez* test because the evidence shows FCS's conduct meets all three *Martinez* prongs. At the same time, they seek to distinguish *Martinez*, arguing that the "broader" definition of employer in the wage order applies in light of the express agency relationship between FCS and Hotline. Plaintiffs make much of Wage Order No. 4's definition of an employer as one "who . . . *indirectly*, or *through an agent* or any other person, employs or exercises control over the wages, hours or working conditions of any person." (Italics added.) But as stated, this language reaches through "straw men and other sham arrangements to impose liability for wages on the actual employer" and *Martinez* held it did not impose liability on the produce merchants in that case because the grower "alone controlled plaintiffs' wages, hours and working conditions." (*Martinez*, *supra*, 49 Cal.4th at p. 71.)

Wage Order No. 4 and the *Martinez* test—not agency doctrine—control in cases involving whether an employer-employee relationship exists for purposes of the Labor Code wage statutes. (*Futrell*, *supra*, 190 Cal.App.4th at p. 1431; *Curry v. Equilon Enterprises*, *supra*, 23 Cal.App.5th at p. 301.) Here, as in *Martinez* (*Martinez*, *supra*, 49 Cal.4th at p. 72), no evidence shows that the statutory surety and bail bondsmen relationship, or the contractual agreements between FCS and Hotline—allowed FCS to exercise control over the wages, hours or working conditions of Hotline's fugitive recovery personnel. As in *Martinez*, "[Hotline] alone . . . hired and fired plaintiffs, trained and supervised them, determined their rate and manner of pay, and set their hours, telling them when and where to report to work and when to

49

take breaks." (*Ibid.*)  There is no evidence FCS "dominated [Hotline's] financial affairs" (*ibid.*) with respect to those matters.

### a.  *Control Over Wages, Hours or Working Conditions*

To show FCS exercised control over their wages, hours and working conditions, plaintiffs refer back to the general agent agreement.  They maintain FCS's control is shown by its requirements that Hotline (1) be "familiar with and abide by the laws and regulations, which apply to any business [it] conducts or performs pursuant to this Agreement"; (2) "comply with any and all procedural directions, rules, and regulations distributed by [FCS] for adoption by [Hotline]"; (3) "avoid any acts or omissions, which may create unauthorized liabilities for [FCS] or impair [FCS's] business reputation"; and (4) assign FCS "any and all rights [Hotline] might have to enforce applicable agreements against [its] sub-producers, employees, and/or independent contractors."  They point out that the general agent agreement anticipated Hotline's bail fugitive recovery efforts, and that FCS's former vice president acknowledged that FCS's contract made bail agents responsible for complying with all laws and regulations, something FCS had acted on in the event of noncompliance.

That FCS required Hotline to abide by applicable laws in dealing with bail bond principals/defendants is not evidence that FCS had the right to control plaintiffs' wages or hours.  The general agent agreement in fact gives Hotline the "exclusive" right to such control.  Nor is such control shown by FCS's conduct in general auditing, seeking updates on forfeitures, or ensuring compliance with licensing or bond paperwork requirements, even if FCS sent some of the communications directly to plaintiffs.  (Accord, *Martinez, supra,* 49 Cal.4th at pp. 75-76 [input from merchants directly to plaintiffs concerning quality and packaging of produce did not establish a

50

supervisory or control relationship with farm worker plaintiffs]; see also *Futrell, supra,* 190 Cal.App.4th at p. 1432 [payroll processing company did not exercise control over worker's wages by "handling the ministerial tasks of calculating pay and tax withholding, and by also issuing paychecks, drawn on its own bank account"]; *Henderson v. Equilon Enterprises, LLC, supra,* 40 Cal.App.5th at p. 1123 [station owner supplied detailed operation manuals, but operator was responsible for directing its employee's compliance with those manuals].) That FCS knows of and benefits from plaintiffs' work is not enough. (*Martinez, supra,* 49 Cal.4th at p. 70.) The fact FCS exercises oversight over its licensed bail agents to protect its financial interests, or directs Hotline to deliver bond collateral or perform other tasks with respect to the bail undertakings, does not make it the employer of Hotline's workforce. Even construing the evidence in the light most favorable to plaintiffs, it does not raise triable issues of material fact that FCS exercises control over wages, hours and working conditions of Hotline's fugitive recovery personnel to warrant liability as their employer.

b. *Suffered or Permitted*

Nor do we agree that plaintiffs' evidence raises an issue as to the second *Martinez* prong, that is, whether it shows FCS acted or had the capacity " 'to prevent the unlawful condition' " or " 'to perform the duty of seeing to it that the prohibited condition does not exist.' " (*Martinez, supra,* 49 Cal.4th at p. 69, italics omitted.) *Martinez* emphasized the fact the produce merchants knew plaintiffs were working and that the work benefitted them was insufficient to raise a triable issue of fact on this point; rather, the defendants there did not suffer or permit the plaintiffs to work because "neither had the power to prevent plaintiffs from working" and the grower "had the exclusive power to hire and fire his workers, to set their

51

wages and hours, and to tell them when and where to report to work." (*Id.* at p. 70.)[16]

So it is here. That FCS representatives knew Hotline was engaged in fugitive recovery efforts—a task inherent in the bail bond business—or that its representatives may have had direct email and other interactions with the plaintiffs with respect to forfeitures, is not evidence that FCS had or exercised any capacity to control the manner in which Hotline paid plaintiffs or prevent Hotline's wage and hour violations. In *Martinez*, the power of the merchant to indirectly force employment decisions by withdrawing business was insufficient to satisfy the second "suffer or permit" prong; "[s]uch a business relationship, standing alone, does not transform the purchase into the employer of the supplier's workforce." (*Martinez, supra*, 49 Cal.4th at p. 70.)

### c. *Common Law Employment Relationship*

In their effort to demonstrate a triable issue of fact as to the common law employment relationship prong, plaintiffs rely on the affidavit for bail undertaking, the face sheet of the bond, and the notice of forfeiture of the bond, which they argue "comprised the written 'engagement' for an employment relationship." Citing *Ayala v. Antelope Valley Newspapers, Inc.*

---

[16] Neither party meaningfully addresses the "ABC" test set forth in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, 916 applying to the relationship between the "hiring entity" and worker to determine whether workers are misclassified as independent contractors. (*Id.* at pp. 955-956; see *Vendor Surveillance Corporation v. Henning* (2021) 62 Cal.App.5th 59, 65.) Plaintiffs cite to the test but do not apply it. At least one court has held the ABC test does not apply in the context of a joint employer theory of liability, as is alleged here, given differences in policy concerns in misclassification cases and because parts of it "do not fit analytically with [joint employer] claims." (*Henderson v. Equilon Enterprises, LLC, supra*, 40 Cal.App.5th at pp. 1128-1129.) We do not reach the question.

(2014) 59 Cal.4th 522, they argue the test is not how much control the hirer exercises, but how much it "retains the right to exercise."[17] Plaintiffs maintain FCS retained "broad control" over Hotline via the general agent agreement, and in turn Hotline imposed significant control over their working conditions, equipment and training.

The latter point is akin to the unsuccessful argument of the plaintiff in *Curry v. Equilon Enterprises, LLC*, *supra*, 23 Cal.App.5th 289 to demonstrate that Shell, the gas station owner, was her employer based on its control over the station operator, ARS. About this, the Court of Appeal said, "Curry's argument reflects Shell exercised control over ARS, and, in turn, ARS exercised control over Curry, but Curry has not explained how Shell exercised control over Curry's wages, hours, or working conditions. Shell required particular tasks be performed by ARS, but did not mandate who or how many employees execute the tasks. For example, if Curry worked four hours a day, took her required 10[-]minute rest break, and a different ARS

---

[17] The only issue in *Ayala* was whether class certification was proper in a dispute over whether the plaintiffs were employees or independent contractors. (*Ayala v. Antelope Valley Newspapers, Inc.*, *supra*, 59 Cal.4th at pp. 527-528 ["The sole question is whether this case can proceed as a class action"].) The merits were not addressed. (*Id.* at p. 527.) *Ayala* expressly did not consider the *Martinez* test. (*Id.* at p. 531.) *Ayala* held the lower court erred by denying class certification on grounds of "individual variations in whether [the hirer] exercised control and because control was not pervasive"; rather, it should have "ask[ed] whether [the hirer's] underlying right of control was subject to variations that would defy class-wide proof and prove unmanageable." (*Id.* at p. 538.) *Ayala* does not govern. But even if its analysis was pertinent, the *Ayala* court also noted about the form contracts at issue in that case: "While any written contract is a necessary starting point, . . . the rights spelled out in a contract may not be conclusive if other evidence demonstrates a practical allocation of rights at odds with the written terms." (*Id.* at p. 535.)

employee conducted the various tasks Shell required of ARS, there is nothing indicating Shell would have any input on that situation. There is not a triable issue of fact on the issue of Shell controlling Curry's working conditions." (*Id*. at p. 303.) Apart from the flawed logic, for the reasons explained above, we disagree that the general agent agreement reflects FCS's "broad control" over Hotline's fugitive recovery personnel, much less their hours, pay, and working conditions.

For the same reasons stated above, we cannot say plaintiffs' evidence establishes the requisite " ' "control of details" ' " by FCS of the manner and means by which they accomplished their work. (*Curry v. Equilon Enterprises, LLC*, *supra*, 23 Cal.App.5th at p. 304.) Plaintiffs acknowledge the secondary factors, but do not directly address them. That the bail bond paperwork identifies FCS as the "Surety Company" and Hotline as the "Bail Bond Agency" or "Bonding Agency" does not alone demonstrate such control over details of plaintiffs' fugitive recovery work as to create a common law employment relationship between FCS and Hotline. Plaintiffs argue the documents "reflect the principal/agency relationship between FCS and [Hotline]," but "[t]he parties' use of a label to describe their relationship does not control and will be ignored where the evidence of their actual conduct establishes a different relationship exists." (*Futrell*, *supra*, 190 Cal.App.4th at p. 1435.) Whatever language plaintiffs relied upon in the bail bond paperwork, there is no evidence FCS in fact had the sort of "control of details" as described in *Curry* and *Futrell*. (*Curry, supra,* 23 Cal.App.5th at pp. 305-308; *Futrell,* at p. 1434.) While FCS may have performed audits, ensured bond paperwork was in order, and sought status updates on forfeitures, there is no evidence demonstrating FCS had input into the hiring, firing, or

54

payment of fugitive recovery personnel, dictated how such personnel accomplished their work, or supervised that work.

Plaintiffs' subjective belief that these documents made FCS their employer or joint employer is the sort of self-serving, uncorroborated evidence that does not meet their burden to demonstrate triable issues of material fact on the question of common law employment.

## V. *Fraud Cause of Action*

In their operative complaint, plaintiffs allege defendants failed to comply with a "non-delegable statutory obligation" to post the Wage Order in a place where employees could read it easily, and a similar nondelegable duty under Labor Code sections 226.8, 2753, and 2800 through 2802 to refrain from making statements inducing them to enter into employment as independent contractors or demand they make expenditures on defendants' behalf. Though plaintiffs further allege defendants intended that plaintiffs remain ignorant of their rights under Wage Order No. 4 and the Labor Code, those allegations are not made against FCS. Likewise, plaintiffs allege certain defendants made affirmative statements as to their classification as independent contractors, but do not include FCS in those allegations. Plaintiffs allege defendants' concealment of information contained in the required postings was a substantial factor in causing them harm.

In moving for summary judgment FCS argued it never had any oral or written communications with plaintiffs, and it was not an employer obligated to post wage orders or workers' compensation notices. It also argued the fraud cause of action was barred by the so called "new right/exclusive remedy" doctrine. Under this principle, " '[w]here a statute [or statutory scheme] creates new rights and obligations not previously existing in the common law, the express statutory remedy is deemed to be the exclusive

55

remedy available for statutory violations, unless it is inadequate.' " (*Beach & Bluff Conservancy v. City of Solana Beach* (2018) 28 Cal.App.5th 244, 262; *Brewer v. Premier Golf Properties* (2008) 168 Cal.App.4th 1243, 1252.)

Plaintiffs contend they can prevail on this cause of action because FCS is an employer "operating through its agent" and is liable under respondeat superior. As for the exclusive remedy doctrine, they argue "FCS does not identify where the Labor Code provides a remedy for falsely inducing an employee . . . to work as an independent contractor, who then incurs damages" nor does it "identify where the Legislature intended to provide an exclusive remedy for such deception, let alone any remedy." They point out that common law deceit predates the statutes of 1872. In their reply papers, plaintiffs say that as a result of defendants' misclassification of them as independent contractors they were unable to obtain medical coverage and suffered tax problems for the failure to withhold taxes from their payroll. They point out that the Labor Code sections on which their fraud claim is based—sections 226.8 and 2753—do not provide remedies to aggrieved workers.

We need not reach the new right/exclusive remedy doctrine. Plaintiffs' pleadings govern the summary judgment issues. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253.) Plaintiffs' operative complaint does not allege affirmative misrepresentations by FCS, and we have already held there is no triable issue that FCS was their employer under a duty to make representations or disclosures under labor laws. An element of fraud based on concealment is that the defendant must have been under a duty to disclose a material fact to the plaintiff. (*Bank of America Corp. v. Superior Court* (2011) 198 Cal.App.4th 862, 870.) Because the alleged deception or

56

concealment was grounded in the violation of Labor Code or other "statutory" obligations, summary judgment was appropriate.

## VI. *Unfair Competition Claim*

Plaintiffs contend for the same reasons stated with regard to their other claims, FCS "is liable" on their claim of unfair competition under theories of agency and respondeat superior. As support, they cite the same authority presented in their opposing summary judgment papers: *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219 as well as a treatise stating that a defendant may be secondarily liable for UCL violations via aiding and abetting, agency, respondeat superior and other theories. At bottom, plaintiffs' argument is an acknowledgment that their UCL claim is dependent on their Labor Code violation claims.

There is not a triable issue of material fact on plaintiffs' UCL claim. Plaintiffs' sole theory under the UCL is that they lost money and property "due to [FCS's] . . . practices of violating the Labor Code . . . ." Having concluded summary judgment was properly granted on plaintiffs' Labor Code violation claims, this dependent claim falls. (Accord, *Martinez*, *supra*, 49 Cal.4th 48, fn. 10 [plaintiffs' UCL claims depended on validity of three Labor Code violation claims; summary judgment affirmed as to all claims based on wage order's employer test]; accord, *Henderson v. Equilon Enterprises, LLC*, *supra*, 40 Cal.App.5th at pp. 1114, 1130 [affirming summary judgment on UCL claim based on conclusion that Shell was not a joint employer under *Martinez*]; *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, 950 [when underlying legal claim fails, so too will a derivative UCL claim].)

VII. *Discrimination/Retaliation and Wrongful Termination* (*Thirteenth and Fourteenth Causes of Action*)

Plaintiffs' treatment of their discrimination/retaliation under FEHA and wrongful termination causes of action are cursory. They maintain the FEHA claim is "valid" because FEHA defines an "employer" as including "any person acting as an agent of an employer, directly or indirectly" (Gov. Code, § 12926, subd. (d)) and they raised triable issues of fact as to "what control FCS had, the existence of an agency relationship, and that [they] were employees." On their wrongful termination claim, they assert only that FCS had admitted summary judgment was properly denied if the court found "a connection between [them] and FCS through agency or through vicarious liability."

A. *FEHA Discrimination/Retaliation Claim*

In moving for summary judgment on plaintiffs' FEHA claim, FCS argued plaintiffs were required to prove FCS was their employer for purposes of FEHA, but there was no triable issue of fact under factors stated in *Vernon v. State of California* (2004) 116 Cal.App.4th 114 relevant to FCS's ability to control the means and manner of their work. Plaintiffs do not address *Vernon* on appeal or address the evidence that FCS did not hire them, pay them, or otherwise control their working conditions. The FEHA standard of an employer "requires 'a comprehensive and immediate level of "day-to-day" authority' over matters such as hiring, firing, direction, supervision and discipline of the employee." (*Patterson, supra*, 60 Cal.4th at p. 499.) The evidence does not create a triable issue on that point. The Government Code definition plaintiffs cite "was intended 'to ensure that *employers* will be held liable if their supervisory employees take actions later found discriminatory.'" (*Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th

568, 580-581.)  Plaintiffs presented no evidence that any FCS representative, supervisory or otherwise, took some discriminatory or retaliatory action against them.

B.  *Wrongful Termination*

As for plaintiff's wrongful termination claim, FCS argued plaintiffs could not establish they were employed by FCS or that FCS terminated them, essential elements of such a claim.  It pointed to evidence that it did not directly or indirectly hire or discharge plaintiffs.  FCS further argued that the common law cause of action for wrongful termination fell with the Labor Code wage and hour claims, and absent a violation of any underlying statute, it was entitled to judgment as a matter of law.  Plaintiffs' argument does not address the evidence on these elements, and it does not persuade us that summary judgment was improperly granted on this claim.

## DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.